No. 60.—CHAMPION BUTLER, REUBEN A. NASH, and JAMES HAMMOCK, admr. of WILLIAM NELSON deceased, plaintiffs in error *vs*. HARDY DURHAM, defendant in error.

[1.] A bill filed by the maker and sureties to certain promissory notes, which were given to an administrator for purchases at his sale, against one into whose possession they were delivered by the payee, who had absconded, to indemnify him and also one of the complainants who were joint sureties on the administration bond, for losses sustained by them in that character — to have said notes cancelled upon averments that they were paid before they were transferred, and that the defendant had instituted three successive suits upon them at law, the first of which was dismissed; the second also dismissed after plea and proof of payment; and that the third was still pending: and with the further averments that the defendant had been fully indemnified as surety on the bond from other sources, with a demand that the defendant answer the allegations; and a special prayer that said notes be delivered up to be cancelled, and a prayer for general relief — *is a single bill, and not demurrable for multifariousness.*

Butler and others *vs.* Durham.

[2.] Multifariousness defined.

[3.] Where there is a special prayer and a general prayer, the complainant under the general prayer may have such other relief only as is consistent with the case made in the bill, and with the special prayer.

[4.] Equity has jurisdiction to direct the cancellation of deeds and other instruments which are *functus officio* by payment or other cause, but will exercise it only in its sound discretion in cases where the defendant at law is not adequate, by reason of loss of testimony, lapse of time, or something peculiar to the case.

The plaintiffs in error instituted their suit in equity against the defendant in error by bill for discovery, relief and injunction in Twiggs Superior Court, returnable to the April Term, 1847.

The defendant demurred to the bill, which after argument before his honour Judge Scarborough was sustained, and the bill dismissed; which is assigned for error.

The bill alleges that at a sale by Thomas J. Perryman as administrator of James R. Lowrey, deceased, the complainant Butler, made purchases, for which he gave fifteen small notes, with Nash and also William Nelson the intestate of Hammock, as his securities, and that the notes were made payable to Perryman, administrator, without any words of negotiability therein.

The bill further alleges that Perryman absconded and left the State, and afterwards by letter to his family directed a trunk containing papers relating to his transactions as such administrator, to be delivered to the defendant Durham and the plaintiff Nash, who were his securities upon his administration bond, given by him as such administrator.

The bill further alleges that the notes aforesaid were in said trunk, amongst other papers, notes, &c. pertaining to said administration, and that there was no regular transfer of them by said Perryman; that the said trunk and its contents, to wit, the said notes and other papers, were not delivered over to any person until the year 1842, long after said notes had become due, and after they had been paid off and discharged by Butler.

The bill further alleges that the trunk and its contents were delivered over by the family of Perryman to Durham, and that Nash never received said trunk, or any part of its contents, and that Perryman never transferred said notes to Durham in any other manner than by the delivery of said trunk and contents in manner aforesaid.

The bill further alleges that said trunk and contents were delivered over to secure and indemnify Durham and Nash against losses that might be incurred in consequence of their suretyship afore-

said; that Durham had control and possession of the whole, and had collected and realized all that had been collected and realized from said indemnity; and from that and other sources of indemnity committed to him by Perryman, said Durham had realized in money and in unquestionable securities, more than sufficient to reimburse him all sums disbursed by him for and on account of said administration.

The bill further alleges that Butler had fully paid off and discharged said notes to Perryman, long before they came to the hands of Durham, and that he had loaned Perryman money for which he held his due-bill.

The bill further alleges that notwithstanding these facts, Durham is annoying the complainants with successive suits upon these notes. That his first suit upon them was in Twiggs Superior Court, in which he suffered a nonsuit. The second was in a Justice's Court, in which the complainants pleaded and proved the payment aforesaid, whereupon he dismissed the same. That notwithstanding said proof, and the knowledge thereby acquired by Durham, he commenced the third suit upon said notes, which is the one sought to be enjoined by this bill.

The bill closes with a prayer for discovery of the amount of indemnities realized by Durham, and the amount paid out by him, and that the notes may be given up to be cancelled, and for further relief, &c. No discovery is asked to enable the complainants to prove their defence of payment, &c.

C. J. McDonald for the plaintiffs in error, cited 1 *John. Ch. R.* 517.

Iverson L. Harris, for the defendant in error.

The case made by the bill of plaintiffs in error is this, Butler bought, in March, 1837, at administrator's sale, certain property, and gave small notes, with Nash and Nelson as securities. The notes contained no words of negotiability, but were payable to Thomas J. Perryman, administrator, by the 25th December, 1839. It is alleged that the notes were not transferred in writing to defendant, but by the mere delivery of a trunk which contained them, after they were past due, in the year 1842; that they were paid to Perryman before the delivery to Durham.

The ostensible purpose of the bill is, to compel the notes as having been paid, to be delivered up.

It is very clear that a discovery is not sought in aid of the common law defence, which the bill alleges to have been filed to the suit pending against the complainants.

The bill praying *relief*, and omitting to make the averment that without a resort to the conscience of defendant they cannot sustain the defence filed, in some material fact, establishes the position, that this is not a bill for discovery only, and in aid of a proceeding at law.

It is an original bill, seeking *discovery and relief* far beyond the exigency of the case made by them.

It seeks to withdraw entirely questions in litigation, from a tribunal having jurisdiction over them, and asks their examination and decision in a new forum.

First. The bill seeks a discovery, whether the trunk of Thomas J. Perryman, containing the notes sued on, and others, was not delivered over to defendant to secure and indemnify him, and Nash one of complainants, against liability as securities on the administration bond of said Perryman.

Whether defendant has not collected and realised all that has been collected therefrom; and whether he has not sold lands of Perryman, and does not now hold good notes more than sufficient to indemnify him for disbursements for Perryman.

What legal connexion can there be between the issue made by plaintiffs of *payment* to Perryman of the notes sued on, and whether they and others were delivered over as indemnities?

What between the issue, and whether defendant had received from the sale of lands of Perryman good notes more than sufficient to indemnify him as Perryman's security?

The discovery sought is *beyond* the case made. . Butler and Nelson have no interest in ascertaining what are the facts involved in the general transaction between Perryman and Durham. They have no right to an account, as they have shown no interest in its being made. If made, it could afford no basis for a decree in their behalf; it can in no wise, nor in any tribunal, aid their defence.

Nor can Nash, who alleges an interest in the indemnities, have it in *company* with Butler and Nelson. He cannot, at his mere caprice, subrogate them to all his rights; he cannot confer upon

them the right to litigate, through a joint and entire proceeding, a matter which is separate and distinct, and exclusively under his control.

He cannot have *one* decree upon this bill and they *another*. For if it were so, it would follow that a judgment would be divisible so as to admit of separate executions.

Second. If complainants are not entitled to the discovery, they cannot be to the relief which such discovery would authorize.

Third. The bill seeks to change the forum of litigation. The comity of courts of concurrent jurisdiction is so exerted as to avoid jealousy and prevent collision.

A court of equity will carefully look into a case before it takes jurisdiction. It requires to be satisfied that at law the remedy of a party is inadequate, ineffectual and imperfect. It allows itself to form no judgment but on the case made in the bill, and beyond it it will presume nothing.

It is the right of a party in some cases to go where he can be relieved, but he must go in a proper manner, and at a seasonable moment.

Let us see if the facts involved in the case of plaintiff are capable of determination in a court of law.

A court of law can determine, that as the notes are without words of negotiability, they cannot pass the legal property by a mere delivery.

It can determine that as the notes were past due when they came to Durham's hands, they were open to all defences to which they could have been had they remained in Perryman's possession.

It can determine the questions of payment and set-off under the facts alleged in Durham's hands.

Indeed by looking to the transcript it will be apparent that all these abstracts are imaginary; for Thomas J. Perryman is the legal plaintiff on the record below.

It is difficult to perceive, as the defences at law are complete in reference to all the notes, why a bill has been resorted to, unless as "fishing" for a discovery to aid Nash in some meditated proceeding.

*By the Court*—NISBET, J. delivering the opinion.

The demurrer to this bill was sustained by the Court below upon several grounds. The two relied upon as erroneous before

this Court are multifariousness, and generally a want of equity in the complainants' case.   Treating of the first named first, I shall advert afterwards to the second, with such particularity as will be sufficiently explanatory of it.

[1.] I do not believe that this bill is multifarious, and such is the judgment of this Court.   It charges that one Thomas J. Perryman became administrator upon the estate of one James R. Lowrey, deceased, and that the defendant, Hardy Durham, and one of the complainants Reuben A. Nash, became his sureties; that at the sale of the property of that estate one of the complainants, Butler, became a purchaser, and made his fifteen several promissory notes, payable to *Thomas J. Perryman, administrator*, for thirty dollars each, with said Reuben A. Nash and William Nelson, the intestate of the complainant Hammock, securities; that Perryman absconded, and after leaving the State, by letter addressed to his family directed a trunk containing papers relating to his transactions on said estate, to be delivered to the defendant, Hardy Durham, and the complainant Nash, for the purpose of indemnifying them as his sureties on the administration bond ; that said trunk, containing the fifteen notes before mentioned, and also other securities, was not delivered to Durham until after these notes fell due ; that the trunk was delivered alone to Durham, and he alone had the control of the papers which it contained; that the fifteen promissory notes were paid off before they came into the possession of Durham, and that from the collection of other notes and securities thus transferred to him, as also from the sale of certain lands conveyed to him by Perryman for the like purpose of indemnity, he, Durham, had been fully indemnified for all advances or losses made or sustained for and on account of his suretyship. The bill further charges, that the fifteen promissory notes were put in suit in the Superior Court of the County of Twiggs, by Durham ; that this suit was non-suited or discontinued, and suits then instituted upon them in a magistrate's court, upon the trial of which suits, the plea of payment being filed was fully proven, and that thereupon they were dismissed; that afterwards suit was again instituted in the Superior Court of the County of Twiggs upon the same notes, which was pending at the time the bill was filed.   The bill further charges, that Butler, the maker of the notes, had loaned a sum of money to Perryman and held his due bill for it.   The complainants ask a discovery as to these facts, *and particularly require of Durham to exhibit a statement of the amount realised by him*

*from the securities transferred to him, other than the fifteen promissory notes, and from the sale of lands conveyed to him by Perryman for his indemnity as surety on the administration bond; and that he answer whether from these sources, independent of the fifteen promissory notes, he had not been fully indemnified.* The complainants pray *specifically* that these notes be delivered up to be cancelled, and that the pending suit upon them be perpetually enjoined; and add the usual prayer for *general relief.*

The question first to·be considered is, was this bill demurra- [2.] ble for *multifariousness?* A bill is multifarious when it contains separate and distinct matters alleged by one plaintiff against the same defendant, or by the same plaintiff against several de-fendants, requiring distinct relief; or by several plaintiffs against one defendant, requiring separate relief against him. 1 *Daniell Eq. Prac.* 437, 450; *Story Eq. Plead.* 2d ed. 225; 3 *Mylne & Craig R.* 85.

If this bill falls within either of these classes it is the last. It is argued that it contains separate and distinct matter because it contains averments in relation to the fifteen promissory notes, such as, *that they have been paid, that they have been proven to have been paid, and that three several suits have been instituted upon them at law:* upon which a decree in favour of all the complainants is prayed, of delivery and cancellation of the notes, and perpetual injunction of the pending suit. And at the same time averments, *that Nash, one of the complainants, and Durham the defendant, are co-sureties for Perryman upon his administration bond, that the papers delivered by Perryman to Durham were intended to indemnify them both for losses or advances on account of their suretyship; that Durham received money upon the securities and also from the sale of land, sufficient to cover all his losses, irrespective of the fifteen notes,* upon which Durham is asked to account with Nash touching their co-suretyship·; and that a decree be rendered against him that he deliver the fifteen notes to Nash. If these statements and prayers were all in the bill, it would be multifarious; some of them are in it and others are inferences of counsel. Durham is not asked to account with Nash, nor is any decree of any kind prayed against him in favour of Nash singly. The *specific object of the bill* is the delivery and cancellation of the notes and the injunction of the suit. This object is sought equally by all the complainants; it is common to them all; they are all bound on the notes and need the same relief. They seek no benefit from the bill except to be protected

from the vexatious suits of the defendant by cancelling the notes, and a perpetual injunction. *Discovery* but not *relief*, is sought from Durham upon the latter class of allegations. This discovery is ancillary to the specific object; for if it should appear from Durham's answer, that all losses which he had sustained by reason of his suretyship for Perryman had been re-imbursed, and it should further appear that from any cause, (as for example the transfer of the notes to him before maturity without notice of the complainants' equity,) the complainants' defence could not be admitted at law; *then* the right of the complainants in equity to the specific relief sought, to wit, the delivery and cancellation of the notes, would be strengthened. This discovery and the allegations upon which it is based, are not separate and distinct from the main object of the bill, but have a very obvious relation to it.

I do not perceive upon what principles of chancery practice a chancellor could, upon this bill, decree that Durham and Nash account as sureties for Perryman. The relief cannot exceed the case made by the bill; it must be, not only within, but consistent with it. The case made by the bill requires the cancelling of the fifteen promissory notes for the benefit of all the complainants; whilst special relief to Nash, according to the argument of the learned counsel, requires that these notes be turned over to him. The one object is inconsistent with the other. Under the prayer for *general* relief, no separate relief could be decreed to Nash. [3.] The rule in equity practice is this—if there be a prayer for *specific* relief and also a prayer for *general* relief, the complainant shall have such *other* relief under the general prayer as is consistent with the case made and the special prayer, and no more. This bill is single and we think the presiding Judge erred in sustaining the demurrer for multifariousness.

[4.] Although at one time questioned, there is no doubt but that a court of chancery will direct the delivery and cancellation or rescission of agreements, securities, deeds or other instruments. This is in fact an old head of equity jurisdiction, and is founded upon the administration of a protective or preventive justice. It illustrates the benign power of chancery as fully as any title of equity jurisprudence. Equity not only relieves against fraud, corrects mistakes, rectifies the evil of accidents, protects and enforces trusts, adjusts the otherwise inexplicable complexity of accounts, and in a thousand ways remedies the insufficiency of all general rules; but based upon great principles of morality, she will

prevent or restrain the exercise of an injurious power, which one man may by common law hold over his neighbour.  It is a jurisdiction of repose as well as relief.  That of which I now speak, that which is claimed in this bill, is held upon the principle *quia timèt ;* that is, the complainant is entitled to the preventive process of the court, *for fear* that such agreements, securities, deeds or other instruments may be vexatiously or injuriously used against him.  The application to a court of equity for either of the purposes before indicated for the exercise of its preventive power, is not strictly speaking a matter of absolute right, but of sound discretion.  The circumstances of each case must determine it to grant or withhold relief.  And it will be seen in the course of this discussion, that precisely in such a case as is now before us, it will exercise jurisdiction with great caution, and even, to use the language of some of the authorities, with *tenderness.*  This jurisdiction is common to courts of law and equity.  To be more specific ; the complainants ask that certain notes which they allege have been paid, shall be delivered up to be cancelled.  Payment is a good and practicable defence at law— both courts can afford relief.  Equity will not necessarily or capriciously interfere with the exercise of common law jurisdiction; her interference is not a matter of strict right; she must subject each case to the judgment of her wonderful and almost sublime discretion, coming in like a divinity, to execute justice only where the tribunals of the law cannot do it *completely.*  Hence the general rule is, that in cases where a party has a remedy at law, equity will not interfere; she will interpose alone when that remedy is not adequate or complete.

Every student knows how long and severe has been the contest for jurisdiction between the courts of law and equity.  At one time it was an acrimonious contest for power; the judges and chancellors were at war, as well as the courts.  All human experience attesting the inadequacy of all systems of positive law to do universal justice, and the rights of man, and the precepts of Christian morality, sanctioning the existence somewhere, of a remedial power, it is not strange that the courts of equity have gradually enlarged the limits of their jurisdiction.  The exercise of chancery powers, in all cases of first impression, is unquestionably judicial legislation.  When precedents are established, they assume the force of law, and thus our magnificent system of equity jurisprudence has grown into order, beauty and strength.  Because of this power of judicial legislation to the extent stated, discretionary

chancery powers should he exercised with extreme caution, forbearance, and even *tenderness.* Parties should be left to the awards of law, unless that law is inadequate to relieve. Exercising a sound and reasonable discretion, we trust, "*secundum arbitrium boni judicis,*" we do not regard the case made in this bill such an one as will justify its retention. This is not one of the cases where equity will divest the jurisdiction of the common law courts; not that we deny to it jurisdiction, but because the equity of the complainants is too weak and their remedy at law is adequate. I shall be compelled to revert to more than one proposition herein already stated. For the present, in behalf of the general power of chancery to cancel or rescind agreements, deeds and other securities, as well as in proof that its exercise is not matter of absolute right, but of sound discretion, I refer to the following authorities: *Story Eq. Jur. secs.* 692, 693, 694, 695, 696; 1 *Fonbl. Eq. b.* 1, *ch.* 3, *sec.* 9, *note i; 3 Woodes. Lec.* 58, *pp.* 464, 465, 466; *Mortlock* vs. *Buller,* 10 *Ves.* 294; 2 *Pr. Wms.* 425; 10 *Mod.* 1; 1 *Bro. P. C.* 268; *Goring* vs. *Nash,* 3 *Atk.* 188; *Buckle* vs. *Mitchell,* 18 *Ves.* 111; *Revell* vs. *Hussey,* 2 *B. & B.* 288; *City of London* vs. *Nash,* 1 *Ves.* 13; 1 *Ves.* 279; 1 *Ves. & Bea.* 527: 1 *Mad. Ch. Pr.* 287; 6 *John. C. R.* 111; 6 *Id.* 222; 3 *Bro.* 18 *n;* 2 *Ves. Jr.* 483; 7 *Ves.* 3; 2 *Anst.* 454; 2 *Vern.* 206; 2 *Pr. Wms.* 170; 3 *Id.* 391; 1 *John. Ch. R.* 517.

It is very important, in order to a correct determination of this question, that we carefully separate and distinguish the different cases in which equity will direct the cancellation or rescission of agreements and deeds or other instruments; and that we isolate *this* case so as to leave it dependent alone upon its own principles. It will be found that the different cases enumerated are determinable upon essentially different principles, and particularly that this case is peculiar. I do not propose to discuss the principles upon which the courts have gone in deciding in favour of the jurisdiction in any of the cases, except those which are analogous to the one now for decision. Justice Story enumerates the cases where equity will cancel *voidable* securities, as follows:

*First.* Where there is *actual fraud* in the party defendant, in which the plaintiff has not participated.

*Second.* Where there is a *constructive fraud* against public policy, and the party plaintiff has not participated therein.

*Third.* Where there is a fraud against public policy, and the party plaintiff *has* participated therein.

And *fourth*. Where there is a constructive fraud by both parties, but they are not "*in pari delicto*."

The two first classes of cases need no illustration, says the learned commentator, "since it is manifestly a result of natural justice that a party ought not to be permitted to avail himself of any agreement, deed or other instrument, procured by his own actual or constructive fraud, or by his own violation of legal duty or public policy, to the prejudice of an innocent party." The third class is illustrated by the common case of a gaming security, which will be ordered to be delivered up notwithstanding both parties have participated in the violation of the law; "because public policy will be best subserved by such a course." The fourth class is illustrated by cases where both parties are implicated in a guilty transaction, but the complaining party has acted under circumstances of oppression, imposition, hardship, undue influence, or great inequality of age or condition, and therefore less guilty than his associate. *Story Eq. Jur. sec.* 694, 695, 298, 300, 301; 3 *Mylne & Craig*, 18, 24.

The case made by this bill does not fall under either of these classes. The bill does not charge actual fraud by the defendant Durham, either in the execution or transfer of the notes, or a constructive fraud against public policy; nor does it admit a participation by complainants with the defendant in a fraud against public policy, nor a constructive fraud by both parties with lessened guilt in the transaction on the part of the complainants— so that we may safely dismiss from our consideration all these classes of cases. To avoid misconstruction, I deem it best to say that the power to cancel is not confined to voidable instruments, deeds or securities; there are cases where equity will direct a security to be cancelled, although void. *Story Eq. Juris. sec.* 701; 1 *Russell R.* 559; 1 *John. Ch. R.* 517. There is also another class of cases to which this case cannot be referred, to wit, where equity will direct the cancellation of deeds or other instruments, at the instance of a party having a just title to them, or an interest derived from them. The case at this bar, I apprehend, if it were sustainable at all, would be sustained under the rule which Story lays down in the following words: "Cases may occur when a deed or other instrument originally valid, has by subsequent events, such as by a satisfaction or payment, or other extinguishment of it, legal or equitable, become "*functus officio*;" and yet its existence may be either a cloud on the title of the other party, or

subject him to the danger of some future litigation, *when the facts are no longer capable of complete proof or have become involved in the obscurities of time.* Under such circumstances, although the deed or other instrument has become a nullity, yet courts of equity will interpose upon the like principles to prevent injustice, and will decree a delivery and cancellation of the instrument." *Story Eq. Juris. sec.* 705. We believe that it cannot be sustained under this head of equity jurisdiction; not for want of jurisdiction in cases of this character, but *because the facts charged do not create for the complainants such an equity as will authorize its exercise.* Let us look again for one moment at the facts upon which they rest their claim for a decree for the cancellation of the fifteen promissory notes. They are these, to wit: *the notes have been paid,* and therefore although once valid they are *functi officio. The holder received them to indemnify himself and his co-surety, for losses sustained by them in that character; he has been fully indemnified from other sources, and therefore is the inference in equity, he has no right to retain them. The holder has dismissed two suits upon these notes* — *one after proof of payment by the defendants; and a third suit is now* (at the time of filing the bill) *pending against the complainants;* therefore is the inference, the complainants fear, that he will again dismiss his suit, subject them to yet greater trouble and costs, and greatly vex and harass them. On these accounts they pray that these notes be delivered up to be cancelled, and that the suit pending at law be perpetually enjoined. " *Audi alteram partem.*" These notes were transferred after maturity, and therefore the defence at law, payment, must be let in; there can be in this case no reason for equitable interference drawn from the negotiable character of the notes; for if they had not been transferred after maturity, being payable to *Perryman, administrator*, without the additional words, *or bearer*, and being negotiated by delivery only, Durham did not acquire the legal title to them. Suit therefore must needs be instituted in the name of Perryman, against whom the defence of payment would always be good; the defence, according to the bill, was, and is at the time of filing it, a *good defence* at law; it is also an *adequate,* that is, a *complete* defence. It is true, as argued by the able counsel for the plaintiff in error, that a court of law cannot order the cancellation of these notes, yet a verdict for the defendants at law would be as perfect a defence as a decree of cancellation in equity. There is no averment that the complainants cannot prove the payment, but the contrary is admitted. There is no

allegation of threats on the part of the defendant, Durham, to dismiss the pending suit and yet further to vex and harass the complainants, on the contrary, the inference may be drawn from the institution of the suit that he intends to try it, and that complainants will be favoured with the opportunity of setting up and sustaining their defence. It does not appear why the first suit was dismissed — it may have been dismissed from necessity, perhaps from some technical exception to the pleadings or proof. The complainants should have averred that it was voluntarily dismissed in order to avoid a verdict for the defendants ; that the second was dismissed for the same reason. I admit, however, that without such averment, the inference is irresistible that the second suit was dismissed to avoid a suit for the defendants. The equity of complainants consists in the determination of the defendant to vex, harass and run them to costs by repeated suits at law, upon notes that he knows has been paid ; and this determination is left to be inferred from his acts, to wit, the institution and dismission of two suits, and the pendency of a third. Is the inference so strong as to demonstrate the fact ? Is it so strong as to justify a court of chancery, in the face of a defence at law which is *adequate* and *available,* to divest the common law jurisdiction in a case where it is in the very act of exercising it ? I think not. In order that equity may interfere, there must be *some difficulty about the defence at law.* Thus, Story says, that equity will interfere and cancel securities *functi officio,* when " *the facts are no longer capable of proof, or have become involved in the obscurities of time."* Story *Eq. Juris. sec.* 705.

Now, if in this case the bill had charged that the *fact of payment* was no longer *capable of proof,* or that from *lapse of time* it was *involved in obscurity,* I could not, no chancellor ought to, hesitate to overrule the demurrer. The case relied upon with the greatest confidence by the plaintiffs in error, is *Hamilton* vs. *Cumming, reported in* 1 *John. Ch. R.* 517. In this case, Kent, designated by a late very distinguished English writer and jurist as " *the great chancellor,"* reviews all the cases upon this head of equity jurisdiction. This was a bill filed for the delivery and cancellation of a bond. It stated that the defendant, pretending to be lawfully possessed of a bond made by James Hamilton, the father of the plaintiff, dated 27th Sept. 1794, conditioned for the payment of sixty pounds, had brought an action at law thereon, against the plaintiff as administrator of his father's estate, and the cause was at issue.

That the defendant pretended to have another bond executed by the plaintiff's father for eight hundred pounds, which he refused to show. The plaintiff charged, that both the bonds were voluntary and without consideration, or were given to indemnify the defendant for being bail in certain suits brought against him, and were to be given up if the defendant was not damnified. That the suits were all settled and the defendant was not damnified. The defendant in his answer admitted that on 22d Sept. 1788, the plaintiff's father executed a bond to him, conditioned to pay nine hundred and ninety-six pounds; that it was given on a special trust, of a secret and delicate nature, and was to be put in force on certain contingencies, which had not,. but which possibly might happen; that he paid no consideration for it, and had no personal interest in it; had never threatened to put it in suit, &c. The chancellor decreed that the bond be delivered and cancelled. In his opinion, he says, "We can consistently with the whole current of authorities, direct it to be cancelled. It is the more proper to do so, *because it is at least doubtful whether the pretended secret trust under which it was taken, and the failure of that trust, would be received as a defence at law. My impression is, that it could not.*" The decree was therefore rendered, with the impression of the chancellor that the plaintiff in the bill could not defend himself at law against the bond. With a like impression as to the defence in the case before this Court, I should not hesitate to decree the cancelling of the notes. Again, Chancellor Kent in this opinion says, "But while I assert the authority of the court to sustain such bills, I am not to be understood as encouraging applications where the fitness of the exercise of the power of the court is not pretty strongly displayed. Perhaps the cases may be all reconciled on the general principle, that the exercise of this power is to be regulated by sound discretion, as the circumstances of the individual cases may dictate; and that the resort to equity to be sustained must be expedient either because the instrument is *liable to abuse from its negotiable nature,* or *because the defence not arising on its face, may be difficult or uncertain at law,* or *from some other special circumstances peculiar to the case, and rendering a resort here highly proper, and clear of all suspicion of any design to promote expense and litigation.*" According to this authority, it is manifest that chancery will not interfere, unless the defence at law is *difficult or uncertain,* or unless there are *special circumstances peculiar to the case.* In the case before us there is no *difficulty or uncertainty* about the defence at

law, no *circumstances peculiar to it*, no want of testimony, no obscuration by reason of lapse of time. Whereas in the New York case, the defence was not only *difficult*, but in Chancellor Kent's opinion, *impossible;* it was *peculiar*, a delicate and secret trust which the defendant would not reveal was the consideration of the bond; *mystery and darkness hung over it like a pall.* Besides *twenty-seven years had elapsed since its execution;* within that time witnesses may be presumed to have died, or removed, so as to make the defence uncertain. The cases are not the same in their facts; they are in vital particulars essentially different. We cannot sustain this bill therefore upon the authority of Hamilton *vs.* Cumming.

I have stated that bills like the present, if sustained at all, and in proper cases they will be retained, are founded on principles *quia timet.* I make this statement upon the authority of Mr. Story. *Story Eq. Jur. sec.* 694. Whilst equity abhors a multiplicity of suits, and will restrain vexatious and costly litigation, yet she is careful not to permit a party, who may be fully redressed or protected at law, to drag his antagonist into her halls, there to burden him with the costs of her cumbersome and tedious procedure. Besides, she has respect to the jurisdictional rights of her sister tribunal, and will not, without strong cause, trench upon them. Whilst this bill is strongly analogous to a bill *quia timet*, it is in some respects like a bill of peace. The ground of jurisdiction in cases of bills of peace is the suppression of useless litigation, and to prevent a multiplicity of suits. It is founded on the maxim " *interest reipublicæ ut sit finis litium.*" That class of cases to which bills of peace are applied most analogous to this is, where the plaintiff has, after repeated and satisfactory trials, established his right at law, and yet is in danger of further litigation and obstruction to his right from new attempts to controvert it. As in case of trial of title in ejectment, and repeated verdicts in favour of the complainant. Lord Cowper refused an injunction after five successive verdicts in favour of the plaintiff at law, saying that it was a suit between A and B, and one man was able to contend with another. The House of Lords overruled him, and granted the injunction. *Courts of equity however, will never interfere in such cases until there is a trial at law, nor until the right has been satisfactorily established at law.* This is well settled, and it is to this principle I desire to advert as applicable to the case under consideration. A verdict for the defendant in ejectment is no bar. He may have a perfect title, and yet his protection at law can never be com-

plete. How strong then is the reason, why in such a case equity should interpose. And yet it will not interfere until after repeated trials at law; some authorities say *five*, and all in favour of the complainant in equity. It will in *no case* interfere until the complainant's right has been established at law. Now in this case a trial and verdict for the complainants at law will be a bar; their remedy at law is capable of being complete. How much more, therefore, should equity refrain to exercise its jurisdiction in this case than in cases of ejectment. The reasoning drawn from the analogous case of bills of peace to quiet ejectments, is strongly against this bill. *Mitford Pl. Eq. by Jeremy*, 143, 144; *Story Eq. Jur. sec.* 859; 1 *Bro. P. C.* 266; *Bunb.* 158; *Eden on Injunctions*, 414, 415, 416; 2 *Sch. & Lef.* 208, 209; 1 *Pr. Wms.* 671, 672; 2 *Atk.* 483; 2 *John. C. R.* 281, 282; 8 *Cranch R.* 462, 468; 1 *Cox R.* 102.

It is the judgment of this Court that the decision on the demurrer to this bill of the Court below be affirmed, on the grounds taken in this opinion.